UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| PIEDMONT OFFICE REALTY TRUST, INC. f/k/a WELLS REAL ESTATE INVESTMENT TRUST, INC., <br><br> Plaintiff, <br><br> v. <br><br> LIBERTY INSURANCE UNDERWRITERS, INC., <br><br> Defendant. | CIVIL ACTION <br> NO. 1:13-CV-2130-AT <br><br> JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff Piedmont Office Realty Trust, Inc. ("Piedmont") alleges as follows in support of its claims against Defendant Liberty Insurance Underwriters, Inc. ("Liberty"):

**PRELIMINARY STATEMENT**

1.  Liberty is a large insurance company that received substantial premiums from Piedmont in exchange for broad insurance coverage. Among other things, Piedmont purchased this insurance to protect itself and its directors against losses arising from Securities Claims.[1] This action arises from Liberty's refusal to honor the promises in its insurance policy with respect to losses incurred in an underlying lawsuit alleging violations of the federal securities laws. The underlying suit involved claims falling squarely within the policy's insuring agreement for Securities Claims, and no exclusion in the policy bars or limits Piedmont's

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the relevant insurance policy.

coverage. Yet, Liberty has nonetheless breached its contractual coverage obligations and refused to reimburse Piedmont for losses covered by the policy. As a result of Liberty's wrongful denial of coverage, Piedmont has been forced to file this action to receive the benefit of the insurance coverage it purchased from Liberty.

## PARTIES, RELATED PERSONS, AND ENTITIES

2.  Piedmont is a corporation organized under the laws of Maryland with its principal place of business at 11695 Johns Creek Parkway, Suite 350, Johns Creek, GA 30097.

3.  Liberty is a corporation organized under the laws of Illinois with its principal place of business at 175 Berkeley Street, Boston, MA 02117. Liberty is an insurance company engaged in the business of selling insurance contracts to commercial entities in Georgia and elsewhere.

4.  Liberty provided coverage to Piedmont under Executive Advantage REIT Policy Number DONY547618001 (the "Liberty Policy").

5.  Liberty issued the Liberty Policy to Piedmont as the Named Insured.[2] The Liberty Policy was delivered to Piedmont at its headquarters in the Atlanta metropolitan area, and the insurance broker that assisted in the placement of the Liberty Policy is located in Atlanta, Georgia.

6.  In exchange for the Liberty Policy, Piedmont paid Liberty substantial premiums from its Atlanta-area headquarters.

---

[2] Piedmont was known as Wells Real Estate Investment Trust, Inc. when the Liberty Policy was issued.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

8. This Court has personal jurisdiction over Liberty because Liberty has submitted to jurisdiction in this state by: (a) transacting business in Georgia; and (b) entering into contracts of insurance covering an entity located within Georgia at the time of contracting.

9. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Piedmont's claims occurred in the Atlanta, Georgia metropolitan area.

**FACTUAL ALLEGATIONS**

10. Piedmont incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-9 above.

**The Insurance Policy**

11. The Liberty Policy provides broad insurance protection for Piedmont against losses arising from third-party claims alleging wrongful acts on the part of Piedmont, its current or former directors and officers, and other Insureds under the Liberty Policy. The Liberty Policy has an applicable limit of $10 million, and has a policy period of April 16, 2007 to April 16, 2008.[3]

12. The Liberty Policy contains several separate coverage sections providing different types of insurance to Piedmont, including the "Directors' and Officers' Liability" coverage section, the "Company Reimbursement and Management Liability" coverage section;

---

[3] A true and correct copy of the Liberty Policy is attached to this Complaint as **Exhibit A**.

the "Company Securities Claim Liability" coverage section; and the "Company Non-Securities Liability" coverage section.

13. The Securities Claim coverage section contains the following insuring agreement:

> [T]he insurer will pay on behalf of the **Company Loss** … which the **Company** shall become legally obligated to pay as a result of a **Securities Claim** first made during the **Policy Period** … against the **Company** for a **Wrongful Act** which takes place during or prior to the **Policy Period**[.]

14. The Liberty Policy defines a "Securities Claim" as "any **Claim** brought against the **Directors** and **Officers** or … the **Company** if such **Claim**:

(1) alleges a violation of the Securities Act [sic] 1933, the Securities Exchange Act of 1934 any similar state statute of [sic] similar common law, or any rules or regulations promulgated thereunder;

(2) arises from the purchase of [sic] sale of, or offer to purchase or sell, any securities issued by the **Company**, whether such purchase, sale or offer involved a transaction with the **Company**, or occurs in the open market; or

(3) is brought by a security holder of the **Company** in his, her or its capacity as such, whether directly as a class action or as a derivative action [sic] behalf of the **Company**, or otherwise alleging a **Wrongful Act** of an **Insured**.

15. If a Claim against Piedmont is covered under the Liberty Policy, Liberty is obligated to pay Piedmont's "Loss," which is defined to include, among other things, "sums which the **Directors** and **Officers** or … the **Company** are legally liable to pay solely as a result of any **Claim** insured by this Policy, including **Claims Expenses**, compensatory damages, settlement amounts and legal fees and costs awarded pursuant to judgements [sic]."

16. "Claims Expenses" are defined in the Liberty Policy to include, among other things, "reasonably [sic] and necessary fees (including attorney's fees and experts' fees) and expenses incurred in the defense or appeal of a **Claim**."

4

17.     The Liberty Policy prohibits Liberty from unreasonably withholding its consent for Piedmont to settle any Claim under the Liberty Policy.

18.     The Liberty Policy provides $10,000,000 of insurance coverage for Loss, including Claims Expenses, attorney's fees, and settlement amounts resulting from Securities Claims against Piedmont and the other Insureds under the Liberty Policy.

## Underlying Securities Litigation

19.     Piedmont is a real estate investment trust ("REIT") primarily engaged in the acquisition and operation of commercial real estate properties.  Piedmont began as a public unlisted REIT, which means that Piedmont was required to file various reports with the Securities and Exchange Commission, but Piedmont's shares were not listed on a national exchange.

20.     On May 25, 2007, Lex-Win Acquisition, LLC ("Lex-Win"), a third party unrelated to Piedmont, made a tender offer for up to 25 million, or 5.2%, of Piedmont's shares for $9.00 per share.  On June 8, 2007, Piedmont filed a Schedule 14D-9 recommendation statement recommending that its shareholders reject the Lex-Win tender offer.

21.     On June 12, 2007, Lex-Win made an amended tender offer for up to 45 million, or 9.3%, of Piedmont's shares for $9.30 per share.  On June 18, 2007, Piedmont filed an amended Schedule 14D-9 recommendation statement recommending that its shareholders reject the revised Lex-Win tender offer (together with the June 8, 2007 Schedule 14D-9, the "Recommendation Statements").

22.     Piedmont's initial charter required Piedmont to list its shares on a national exchange or liquidate by January 30, 2008 (the "Liquidity Deadline").  On October 16, 2007,

Piedmont filed a proxy statement seeking shareholder approval to extend Piedmont's January 30, 2008 Liquidity Deadline for up to three years (as revised and supplemented, the "Extension Proxy").

23.     On October 25, 2007 Washtenaw County Employees' Retirement System ("Washtenaw") filed a putative class action against Piedmont and certain of its directors in the United States District Court for the Northern District of Georgia ("the Underlying Suit").[4]  The complaint in the Underlying Suit (the "Original Complaint") alleged that Piedmont's directors violated § 14(e) of the Exchange Act, Rule 14e-2(b) promulgated thereunder, and state law fiduciary duties in issuing the Recommendation Statements.  The Original Complaint also alleged that Piedmont's directors violated § 14(a) of the Exchange Act, Rule 14a-1 promulgated thereunder, and state law fiduciary duties in issuing the Extension Proxy.

24.     Washtenaw filed an amended complaint in the Underlying Suit (the "First Amended Complaint") on May 19, 2008 that contained largely the same state law and federal securities claims as the Original Complaint.  Piedmont moved to dismiss the First Amended Complaint, and the Court granted the motion in part and denied it in part on March 30, 2009.  The Court dismissed Washtenaw's state law claims in their entirety and dismissed parts of Washtenaw's federal securities claims.

25.     Washtenaw amended its complaint again on April 20, 2009 (the "Second Amended Complaint").  The Second Amended Complaint asserted claims under § 14(e) of the Exchange Act and Rule 14e-2(b) in connection with the Recommendation Statements and

---

[4]  The Underlying Suit is styled *In Re: Piedmont Office Trust Inc. Securities Litigation*, No. 1:07-CV-2660-CAP (N.D. Ga.).

§ 14(a) of the Exchange Act and Rule 14a-1 promulgated thereunder in connection with the Extension Proxy.

26. On March 10, 2010, the Court granted Washtenaw's motion to certify a class consisting of two subclasses—a tender offer subclass and a proxy subclass. Piedmont appealed the Court's class certification decision to the United States Court of Appeals for the Eleventh Circuit, and the Eleventh Circuit vacated the Court's order certifying a class in a per curiam order on April 11, 2011.

27. After the Eleventh Circuit issued its decision, Washtenaw amended its complaint in the Underlying Suit for a third time (the "Third Amended Complaint"). Piedmont moved to dismiss the Third Amended Complaint, and on August 27, 2012, the Court dismissed Washtenaw's remaining claims in the Underlying Suit.

28. Washtenaw filed a notice of appeal in the Underlying Suit on September 26, 2012.

### Liberty's Failure To Honor Its Obligations Under the Liberty Policy

29. Piedmont provided Liberty timely notice of the Underlying Suit in November 2007. After receiving notice, Liberty acknowledged that the Underlying Suit was a covered Securities Claim under the Liberty Policy and began paying Piedmont's defense costs in the Underlying Suit.

30. On October 11 and 12, 2012, the parties to the Underlying Suit participated in a mediation in an attempt to reach a resolution of the Underlying Suit. At the time of the mediation, almost $7 million in limits remained under the Liberty Policy. Liberty attended the mediation and from the outset took the unreasonable position that it was unwilling to contribute more than $250,000 to any potential settlement, notwithstanding Liberty's acknowledgement that

the Underlying Suit is a covered Securities Claim under the Liberty Policy and the fact that Washtenaw demanded over $138 million in damages in the Underlying Suit.  Piedmont kept Liberty apprised of all developments during the mediation, including offers and counteroffers to settle, but despite a request to Liberty that it consent to the settlement, Liberty maintained its unreasonable position that it was unwilling to contribute more than $250,000 to any settlement.

31. Washtenaw eventually indicated that it was willing to withdraw its appeal in and settle all claims arising in connection with the Underlying Suit for a payment of $2.6 million. Despite Liberty's unreasonable refusal to consent to the full settlement, Piedmont agreed to settle the Underlying Suit for $2.6 million.

32. By unreasonably refusing to consent to the requested settlement for $2.6 million, Liberty put its own interests ahead of Piedmont's and the other Insureds' interests, subjecting them to the risk of reversal on appeal, the significant costs of discovery and trial, and alleged damages well in excess of the limits of their insurance coverage.

33. On November 8, 2012, Piedmont wrote a letter to Liberty on behalf of all Insureds under the Liberty Policy demanding payment of the full $2.6 million settlement in the Underlying Suit and notifying Liberty that Piedmont would be forced to seek all relief available under O.C.G.A. § 33-4-6 if Liberty continued to refuse to honor its obligations under the Liberty Policy.

34. Liberty responded by letter dated November 14, 2012, asserting that the $2.6 million settlement amount was unreasonable, but the letter failed to explain how refusing to pay

an additional $2.35 million[5] for an admittedly covered Securities Claim was reasonable in light of the substantial risks to which Liberty exposed Piedmont.

35. On April 18, 2013, the Court entered a final order approving the settlement in the Underlying Suit.

36. On April 19, 2013, Piedmont yet again wrote a letter to Liberty on behalf of all Insureds under the Liberty Policy reiterating its demand for payment of the full $2.6 million settlement in the Underlying Suit and notifying Liberty that Piedmont would be forced to seek all relief available under O.C.G.A. § 33-4-6 if Liberty continued to refuse to honor its obligations under the Liberty Policy.

37. Liberty responded on April 29, 2013 by contributing $250,000 towards the settlement of the Underlying Suit. Liberty, however, maintained its refusal to honor its obligation under the Liberty Policy to pay the remaining $2.35 million of the settlement.

38. Because Liberty unreasonably withheld its consent to the settlement and refused to honor its obligation to fund the full settlement amount in violation of O.C.G.A § 33-4-6, Piedmont was forced to pay $2.35 million to settle the Underlying Suit without the benefit of the insurance coverage Piedmont purchased from Liberty.

---

[5] Liberty was willing to pay (and did pay) only $250,000 toward the full settlement amount in the Underlying Lawsuit.

## COUNT I
## BREACH OF CONTRACT

### (FOR REFUSING TO FUND THE FULL SETTLEMENT IN THE UNDERLYING SUIT)

39. Piedmont incorporates by reference, as if fully set forth herein, the facts set forth above in paragraphs 1-38 above.

40. The Liberty Policy is an insurance contract under which Liberty was paid substantial premiums in exchange for providing broad insurance coverage, including coverage for losses arising from the Underlying Suit.

41. Piedmont has complied with all applicable provisions of the Liberty Policy.

42. By denying coverage to Piedmont and the other Insureds for the full $2.6 million settlement in the Underlying Suit, Liberty has expressly and wrongfully denied its coverage obligations and declined to honor the promises it made when it issued the Liberty Policy. Liberty's wrongful denial of its coverage obligations to Piedmont is a breach of the Liberty Policy.

43. As a result of Liberty's breach of the Liberty Policy, Piedmont has sustained substantial damages, in an amount to be established at trial, for which Liberty is liable to Piedmont.

## COUNT II
## O.C.G.A § 33-4-6

### (FOR STATUTORY DAMAGES FOR REFUSAL TO PAY)

44. Piedmont incorporates by reference, as if fully set forth herein, the facts set forth above in paragraphs 1-43 above.

45. On November 8, 2012, and again on April 19, 2013, Piedmont sent demand letters to Liberty, demanding that Liberty fulfill its legal obligations under the Liberty Policy by funding the full $2.6 million settlement in the Underlying Suit. These demands informed Liberty that, if it refused to pay the full amount demanded as required by the Liberty Policy for the covered Claim, Piedmont would assert a claim under O.C.G.A. § 33-4-6 for all available damages and relief.

46. Piedmont was forced to pay $2.35 million to settle the Underlying Suit without the benefit of the insurance coverage Piedmont purchased from Liberty. Piedmont's claim for coverage under the Liberty Policy for reimbursement of the full settlement amount has therefore, by the terms of the Liberty Policy, become due and payable.

47. Upon the date of filing this Complaint, more than sixty days have passed since Piedmont's November 8, 2012 and April 19, 2013 demand letters.

48. Liberty has failed to act in good faith in refusing to pay Piedmont's claim under the Liberty Policy. There are no legitimate or substantial legal grounds for Liberty's denial of coverage to fund the full settlement of the Underlying Suit.

49. Liberty's failure to act in good faith has inflicted upon Piedmont and the other Insureds expense, loss, and injury in addition to the amount claimed under the Liberty Policy.

50. Pursuant to O.C.G.A. § 33-4-6, Piedmont is entitled to statutory penalties, in an amount to be determined by a jury, of up to 50% of Liberty's total liability under the Liberty Policy for the Claim, plus the attorneys' fees Piedmont has incurred in this lawsuit.

## PRAYER FOR RELIEF

**WHEREFORE,** Piedmont respectfully prays that the Court:

(1) enter judgment on Count I of the Complaint in favor of Piedmont and against Liberty;

(2) enter judgment on Count I of the Complaint for compensatory damages in favor of Piedmont and against Liberty in an amount sufficient to compensate Piedmont for all losses sustained as a result of Liberty's breach of the Policy and refusal to pay the full $2.6 million settlement of the Underlying Suit;

(3) enter judgment on Count II of the Complaint awarding Piedmont up to an additional 50% of the total insured loss for the Claim that Liberty refused to pay in bad faith, plus the attorneys' fees incurred by Piedmont in pursuing recovery in this lawsuit;

(4) award to Piedmont and against Liberty prejudgment interest, to be calculated according to law, to compensate Piedmont for the loss of use of funds caused by Liberty's wrongful refusal to pay Piedmont for the full $2.6 million settlement in the Underlying Suit; and

(5) award Piedmont such other, further, and additional relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Piedmont hereby demands that all claims in this action be tried to a jury.

Respectfully submitted this 25th day of June, 2013.

                                          */s/ Anthony P. Tatum*
                                          Anthony P. Tatum
                                          Georgia Bar No. 306287
                                          Bethany M. Rezek
                                          Georgia Bar No. 553771
                                          KING & SPALDING LLP
                                          1180 Peachtree Street
                                          Atlanta, GA  30309
                                          404-572-4600 (Phone)
                                          404-572-5138 (Fax)
                                          ttatum@kslaw.com
                                          brezek@kslaw.com

                                          *Attorneys for Plaintiff*